2003 ND 86

**TRINITY HEALTH, Plaintiff and Appellee,**

v.

**NORTH CENTRAL EMERGENCY SERVICES, P.C., Defendant and Appellant.**

**No. 20020317.**

Supreme Court of North Dakota.

June 3, 2003.

James B. Lynch, Dorsey & Whitney LLP, Minneapolis, MN, and David J. Hogue (appeared), Pringle & Herigstad, P.C., Minot, ND, for plaintiff and appellee.

Randall J. Bakke, Smith Bakke Oppegard Porsborg Wolf, Bismarck, ND, for defendant and appellant.

VANDE WALLE, Chief Justice.

[¶ 1] North Central Emergency Services, P.C. ("NCES") appealed a summary judgment in Trinity Health's action for a declaratory judgment that NCES breached an agreement to provide emergency room services and that Trinity Health had no further obligations to NCES under the

agreement. We conclude genuine issues of material fact about what the parties meant in an exchange of letters by their attorneys, whether or not NCES breached the contract, and whether Trinity Health terminated the contract preclude summary judgment. We affirm in part, reverse in part, and remand for further proceedings.

[¶ 2] On May 1, 2001, "QHG of Minot, Inc. d/b/a UniMed Medical Center–St. Joseph's Hospital ('the Hospital')" ("UniMed") and NCES, which employed its sole owner, Dr. Michael Boulter and two other physicians, entered into an agreement for emergency room medical services. Under the agreement, NCES was required to have a physician, initially Dr. Boulter, serve as medical director and "schedule work hours and supervise the work of Hospital employees in the Department" and be "available at reasonable times for consultations with" UniMed staff, and to "provide coverage seven (7) days per week, twenty-four (24) hours per day." The agreement further provided:

8. *EXCLUSIVITY.* As long as [NCES] and Physician have not failed to fulfill any of their obligations under this Agreement, [UniMed] will not hereafter extend Active Medical Staff privileges to any other Physician not affiliated with [NCES] to practice Specialty in the Department. . . .

15. *TERMINATION OF AGREEMENT.*

A. *Term.* The term of this Agreement will be for four years commencing September 1, 2000 and ending on August 31, 2004 unless otherwise terminated as provided below. It may be renewed upon mutual agreement of the parties.

B. *Termination.*

1. This Agreement may be terminated immediately by [UniMed] upon the occurrence of any of the following events:

. . . .

(c) upon the dissolution of [UniMed] if no successor to [UniMed] is formed for at least thirty (30) days thereafter; upon closure of [UniMed];

. . . .

5. After the initial 24 months, this Agreement can be Terminated without cause by either party upon one-hundred eighty (180) Days written notice to the other.

. . . .

16. *NOTICES.* Any notices or payments permitted or required by this Agreement shall be deemed made on the day personally delivered in writing or mailed by certified mail, postage prepaid, to the other party. . . .

21. *ASSIGNABILITY.* The right and obligations of [UniMed] shall inure to the benefit of and be binding upon the successors and assigns of [UniMed]. [NCES] may not assign its rights or obligations under this Agreement, by operation of law or otherwise, without [UniMed's] written consent. . . .

23. *AMENDMENTS.* Any amendments to this Agreement will be effective only if in writing and signed by the parties.

[¶ 3] On March 20, 2001, UniMed informed the UniMed staff, including Dr. Boulter, that a sale of UniMed to Trinity Health was tentatively scheduled for April 27, 2001. By letter of March 29, 2001, NCES's attorney, Richard P. Olson, advised Trinity Health his law firm had been retained by NCES in connection with NCES's agreement with UniMed and said "[i]t would appear to be appropriate for immediate discussions to take place relative to your fulfillment of the contract."

[¶ 4] On April 4, 2001, UniMed informed its contract providers it was being sold to Trinity Health, which would assume UniMed's third-party contracts and service agreements. NCES asserts Trinity orally indicated on April 20 and 21, 2001, it was going to terminate the contract. NCES's attorney advised Trinity Health's attorney that, in his view, under Paragraph 15B(5), "the contract is not terminable until September 1, 2002, and then only after 180 days written notice to the other party." NCES's attorney also related:

It is my understanding ... Trinity Health ... plans to prematurely terminate the services of [NCES]. Subsequent to receiving formal notice of the premature termination by Trinity Health, we will put forth an outline of our proposed resolution.

[¶ 5] In a May 1, 2001, letter, Trinity Health's attorney advised NCES's attorney, in part:

Section 15.B.1 permits Trinity Hospitals to terminate the Agreement "immediately" upon the occurrence of certain events. In particular, clause (c) permits the immediate termination of the Agreement "upon closure of the Hospital." The Agreement defines "Hospital" as UniMed Medical Center–St. Joseph's Hospital ("UniMed").

Upon completion of the acquisition, Trinity Hospitals will maintain a single emergency department at the existing Trinity Hospital facility. . . . As the Hospital's emergency department effectively will be closed and the terms of the Agreement require North Central to provide emergency services exclusively at the "Hospital", Trinity Hospitals will terminate the Agreement immediately, as permitted under Section 15.B.1(c). In addition, dissolution of UniMed and its Emergency Trauma Center makes it

impossible for North Central to perform its services as intended by the Agreement. This would not be "premature termination" of the Agreement.

I hope this letter clarifies our understanding of the Agreement. If you have any questions, please contact me. Meanwhile, Trinity will provide a separate formal termination notice as required by Sections 15 and 16 of the Agreement.

[¶ 6] In a May 16, 2001, letter, Trinity Health's attorney advised NCES's attorney "Trinity Health has decided to continue to utilize the services of [NCES]" and adverted to possible changes in the agreement, including elimination of the exclusivity provision, the medical director obligations, and "the requirement of supervision of anyone other than the physicians supplied by North Central (Agreement at Section 1.F)." The letter also said: "Please let me know if there are other items that we should address in an addendum." The letter also addressed anticipated workload changes:

For quality of care reasons (especially given the expectation that the ER at Trinity will have an increased number of visits over its current workload), ER shifts will be no more than twelve hours in duration. To the extent that [NCES] physicians will work shifts at Convenient Care, a hospital based clinic, those shifts will typically be either 4 or 8 hours in length.

NCES's attorney responded, in part, on May 18, 2001:

You[r] recent suggestion that Trinity Health would like to continue to utilize the services of [NCES] with substantial contract revisions does not appear to be very workable. The work loads at the two emergency rooms have been quite different. The shifts and scheduling between the two emergency rooms are

quite different. By way of example, the St. Joseph's emergency room has maintained quality care utilizing 72–hour shifts, and as your correspondence indicates, quality care at Trinity's emergency room requires 12–hour shifts.

[¶ 7] On May 25, 2001, Trinity Health's attorney advised NCES's attorney that Trinity Health would transfer all emergency department services to Trinity Hospital at 7:00 a.m., on June 4, 2001. He also advised:

Although Trinity retains its rights under the Agreement, including its rights under the termination provisions, Trinity is *not* terminating the Agreement as part of the transfer that will take place on June 4. The focus of some of our prior communications had been understanding the termination rights of the parties, however, the fact of the matter is that Trinity has never provided NCES with a notice of termination.

[¶ 8] Trinity Health closed the UniMed emergency services department on June 4, 2001, and NCES refused to provide emergency services at the Trinity Hospital emergency room.

[¶ 9] Trinity Health's action against NCES seeks a declaratory judgment that, among other things, "failure of NCES to perform under the Agreement since June 4, 2001 constitutes a material breach of the Agreement" and "Trinity Health has no further obligations to NCES under the Agreement." NCES answered the complaint, denying it breached the agreement and asserting affirmative defenses. NCES also counterclaimed for damages, alleging breach of contract by Trinity Health and estoppel.

[¶ 10] NCES moved for partial summary judgment dismissing all of Trinity Health's claims on November 9, 2001. The trial court denied NCES's motion for par-

tial summary judgment, explaining in a July 25, 2002, letter memorandum:

[W]hen Trinity Health purchased UniMed "the hospital" as defined in the agreement, became Trinity Health as a successor and assignee.

The defendants further argue as part of their motion that full performance of the contract limited the performances of services to a specific physical location. I find that it did not. . . . There is nothing in the agreement to guarantee or require that the performance of the emergency medical services contracted for . . . take place only at a physical location of UniMed–St. Joseph's. I find nothing in the agreement which prohibited the possibility of a relocation of emergency services required under the agreement.

The defendant also raised the issue of whether or not the modifications to the agreement proposed by Trinity Health were material. I find they were not.

The trial court granted Trinity Health's motion for a protective order and denied NCES's motions to compel discovery and compliance with subpoenas, explaining:

It seems to me, simply put, that since there was no termination of the contract . . . the side issues as to how other medical providers may or may not have been terminated, transferred or in some cases resigned is not relevant to the issues at hand in this case.

The trial court denied NCES's motion in limine to dismiss Trinity Health's mitigation of damages defense to NCES's claim and for a determination NCES was not required to mitigate damages.

■ [¶ 11] In a September 23, 2002, order, the court found consolidation of emergency services was not a termination of the agreement by Trinity, modifications were not material, Trinity Health did not breach the agreement, NCES was obligat-

ed to perform under the agreement, and denied NCES's motion for partial summary judgment. In a handwritten[1] order of September 23, 2002, the court ruled Trinity Health was entitled to a declaratory judgment:

4. I agree with the Plaintiff on the estoppel issue. It is a defense by definition; by hornbook law; and by caselaw. It is not a cause of action and as such cannot be a counter claim

5. I agree with the Plaintiff that there are no issues for a jury to resolve. There was no material modification by Trinity in law; nor in fact for a jury to decide

6. The Plaintiff did not terminate the agreement with the Defendant. It did move the place the Defendant was to perform by three blocks and I have ruled this was within it[ ]s rights as successor and assignee of the "hospital" agreement

7. The Plaintiff seeks only declaratory judgment that Defendants failure to perform under the Agreement was a material breach. I so find

8. No jury will be called

9. The case is over.

[¶ 12] NCES in its appeal from the summary judgment entered November 1, 2002, contends the trial court erred in (1) granting summary judgment in favor of Trinity Health, (2) dismissing NCES's claims and defenses, (3) denying NCES's motion for partial summary judgment dismissing Trinity Health's breach of contract claim against NCES, (4) denying NCES's motion in limine, and (5) in denying NCES's motions to compel discovery and compliance with subpoenas, and in granting Trinity Health's motion for a protective order.

■ [¶ 13] NCES has contended the trial court erred in granting summary judgment in favor of Trinity Health, which did not move for summary judgment on its breach of contract claim. When there has been a motion for summary judgment, but no cross-motion, the court already is engaged in determining if a genuine issue of material fact exists, the parties have been given an opportunity to present evidence to support or refute the request, and the weight of authority is that summary judgment may be rendered in favor of the party opposing the motion without a formal cross-motion. 10A C. Wright et al., *Fed. Prac. & Proc.: Civil 3d § 2720. See also Olander v. Gail Wachter Invs.*, 2002 ND 65, ¶ 25, 643 N.W.2d 29 (lack of motion for summary judgment dismissing negligence claims did not preclude trial court from dismissing negligence claims).

[¶ 14] We recently reiterated when a motion for summary judgment may be granted:

Summary judgment is a procedural device for promptly and expeditiously disposing of an action without a trial if either party is entitled to judgment as a matter of law and no dispute exists as to either the material facts or the reasonable inferences to be drawn from undisputed facts, or resolving the factual disputes will not alter the result. Issues of fact may become questions of law if reasonable persons could reach only one conclusion from the facts. Summary judgment is appropriate against parties who fail to establish the existence of a

1. Except in exigent circumstances, the trial court's issuance of handwritten orders does not evidence care by the court and deprecates the importance of the proceedings to the litigants.

factual dispute on an essential element of their claim and on which they will bear the burden of proof at trial.

*Hilton v. North Dakota Educ. Ass'n*, 2002 ND 209, ¶ 23, 655 N.W.2d 60 (citations omitted).

[¶ 15] On appeal from a summary judgment, we review the evidence in the light most favorable to the party opposing the motion for summary judgment, giving that party the benefit of all inferences that reasonably can be drawn from the evidence. *Abel v. Allen*, 2002 ND 147, ¶ 8, 651 N.W.2d 635. "Whether the trial court has properly granted summary judgment is a question of law which we review de novo on the entire record." *Wahl v. Country Mut. Ins. Co.*, 2002 ND 42, ¶ 6, 640 N.W.2d 689.

[¶ 16] A contract is ambiguous if rational arguments can be made for different interpretations. *Gawryluk v. Poynter*, 2002 ND 205, ¶ 9, 654 N.W.2d 400. Contracting parties' ambiguously expressed intentions are questions of fact. *Bohn v. Johnson*, 371 N.W.2d 781, 788 (N.D.1985). Whether a contract has been substantially performed and whether a party has breached a contract are questions of fact. *Wachter v. Gratech Co., Ltd.*, 2000 ND 62, ¶ 17, 608 N.W.2d 279. Under N.D.C.C. § 9-09-06, a written contract "may be altered by a contract in writing or by an executed oral agreement and not otherwise." A party cannot be held liable for damages that flow from a material alteration of a contract without its consent. *Koch Hydrocarbon Co. v. MDU Res. Group, Inc.*, 988 F.2d 1529, 1538-39 (8th Cir.1993). *See also Barnes v. St. Joseph's Hosp.*, 1999 ND 204, ¶ 14, 601 N.W.2d 587 (duty to act in good faith does not require a party to accept a material change in contract terms); *Porter v. Hardy*, 10 N.D. 551, 551, Syll. ¶ 1, 88 N.W. 458, 458 (1901) ("The material alteration of a written contract by a party entitled to a benefit thereunder, or with his consent, extinguishes all the executory obligations of the contract in his favor as against parties who do not consent to the alteration."). "This Court has often said an assignee acquires no greater rights than those of the assignor, and simply stands in the shoes of the assignor." *Global Fin. Servs., Inc. v. Duttenhefner*, 1998 ND 53, ¶ 19, 575 N.W.2d 667.

[¶ 17] Not only can rational arguments be made for different interpretations of the contract, there are genuine issues of material fact about what the parties meant in the exchange of letters by their attorneys, the actions of the parties, whether or not NCES breached the contract, and whether or not Trinity Health terminated the contract. Those issues preclude summary judgment. We conclude the trial court erred in granting summary judgment in favor of Trinity Health.

[¶ 18] Because we have determined there were genuine issues of material fact with regard to the parties' intent, breach of contract, and termination of the contract, we necessarily conclude the trial court did not err in denying NCES's motion for summary judgment dismissing Trinity Health's breach of contract claim against NCES.

[¶ 19] We need not address the other issues NCES has raised, because determination of those issues is not necessary for disposing of this case and those issues are not certain to arise upon remand. *Loberg v. North Dakota Workers Comp. Bureau*, 1998 ND 64, ¶ 12, 575 N.W.2d 221.

[¶ 20]   The order denying NCES's motion for summary judgment is affirmed, the order granting Trinity Health summary judgment is reversed, the judgment is reversed, and the matter is remanded for further proceedings consistent with this opinion.

[¶ 21] CAROL RONNING KAPSNER, MARY MUEHLEN MARING, WILLIAM A. NEUMANN and DALE V. SANDSTROM, JJ., concur.